*ELECTRONICALLY FILED*

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY
# CENTRAL DIVISION
# LEXINGTON

**BRIAN TODD DUMPHORD**                                        **PLAINTIFF**

**VS.**

**TROOPER JACK GABRIEL**                                        **DEFENDANTS**
**INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY**
**AS TROOPER OF DEPARTMENT OF KENTUCKY STATE POLICE**

SERVE:        Trooper Jack Gabriel
              Unit 811, Post 12
              1250 Louisville, Road
              Frankfort, KY 40601

SERVE:        Trooper Jack Gabriel
              Unit 811, Post 12
              5751 Briar Hill Road
              Building 30
              Lexington, Kentucky 40516

SERVE:        Trooper Jack Gabriel
              Unit 811, Post 12
              KSP Headquarters
              919 Versailles Road
              Frankfort, KY 40601
And

**TROOPER JOSEPH KENNEY,**
**INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY**
**AS TROOPER OF DEPARTMENT OF KENTUCKY STATE POLICE**

SERVE:        Kentucky Secretary of State
              Attn: Summons Branch
              700 Capital Avenue, Suite 86
              Frankfort, Kentucky 40601

SERVE:        Trooper Joseph Kenney
              4265 US Highway 25
              Post 6 Dry ridge
              Dry Ridge, Kentucky 41305

SERVE:     Trooper Joseph Kenny
Department of Kentucky State Police
KSP Headquarters
919 Versailles Road
Frankfort, KY 40601

SERVE:     Trooper Joseph Kenny
FBI National Academy Association Inc
422 Garrisonville Rd
# 103
Stafford, VA 22554

SERVE:     Trooper Joseph Kenny
FBI Academy
1234 Range Road
Quantico, VA 22135
Frankfort, Kentucky 40601

SERVE:     Trooper Joseph Kenny
FBI Headquarters
935 Pennsylvania Avenue, NW
Washington, D.C. 20535-0001

And

**COMMONWEALTH OF KENTUCKY,**
**JUSTICE AND PUBLIC SAFETY CABINET,**
**DEPARTMENT OF KENTUCKY STATE POLICE**

SERVE:     Commonwealth of Kentucky
Justice and Public Safety Cabinet
Department of Kentucky State Police
Office of the Secretary
125 Holmes Street
Frankfort, KY 40601

SERVE:     Department of Kentucky State Police
KSP Headquarters
919 Versailles Road
Frankfort, KY 40601

SERVE:     Daniel Cameron
Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, KY 40601

And

2

**COMMISSIONER RODNEY BREWER,**
**INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY**
**AS COMMISSIONER OF THE DEPARTMENT**
**OF THE KENTUCKY STATE POLICE**

SERVE:     Commonwealth of Kentucky
           Justice and Public Safety Cabinet
           Department of Kentucky State Police
           125 Holmes Street
           Frankfort, KY 40601

SERVE:     Department of Kentucky State Police
           KSP Headquarters
           919 Versailles Road
           Frankfort, KY 40601

And

**SERGEANT SONNY DUNAWAY,**
**INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY**
**AS SERGEANT OF THE**
**SPECIAL OPERATIONS TROOP**

SERVE:     Sergeant Sonny Dunaway
           Unit 811, Post 12
           5751 Briar Hill Road
           Building 30
           Lexington, Kentucky 40516

SERVE:     Sergeant Sonny Dunaway
           KSP Headquarters
           919 Versailles Road
           Frankfort, KY 40601

And

**CAPTAIN CHAD MILLS,**
**INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY**
**AS CAPTAIN AND POST COMMANDER**
**OF DEPARTMENT OF KENTUCK STATE POLICE**
**POST 6**

SERVE:     Captain Chad Mills
           4265 US Highway 25
           Post 6 Dry ridge
           Dry Ridge, Kentucky 41305

3

SERVE:    Captain Chad Mills
KSP Headquarters
919 Versailles Road
Frankfort, KY 40601

And

**DR. SANDRA F. GEILE, MD
INDIVIDUALLY**

SERVE:    Dr. Sandra f. Geile, MD
466 Linden Ave., Ste. A
Harrodsburg, KY 40330

SERVE:    CT Corporation System
306 W. Main Street, Ste. 512
Frankfort, KY 40601

And

**BOURBON COMMUNITY HOSPITAL, LLC**

SERVE:    CT Corporation System
306 W. Main Street, Ste. 512
Frankfort, KY 40601

\* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT

Comes the Plaintiff, **BRIAN TODD DUMPHORD**, by counsel, and for his complaint hereby states as follows:

### PARTIES

1. Plaintiff Brian Dumphord (hereafter "Mr. Dumphord") is a resident of Lexington, Fayette County, Kentucky.

2. Defendant Trooper Jack Gabriel (hereafter "trooper Gabriel") is a natural person and was at all times relevant hereto employed as a trooper/police officer with the Department of the Kentucky State Police in Frankfort, Kentucky.

4

3.  Defendant Trooper Joseph Kenney (hereafter "trooper Kenney") is a natural person and was at all times relevant hereto employed as a trooper/police officer with the Department of the Kentucky State Police in Frankfort, Kentucky.

4.  Defendant Commissioner Rodney Brewer (hereafter "Commissioner Brewer") is a natural person and was at all times relevant hereto employed as Commissioner of the Department of the Kentucky State Police in Frankfort, Kentucky.

5.  Defendant Sergeant Sonny Dunaway (hereafter "sergeant Dunaway") is a natural person and was at all times relevant hereto employed as Sergeant with the Department of the Kentucky State Police in Frankfort, Kentucky.

6.  Defendant Captain Chad Mills (hereafter "Captain Mills") is a natural person and was at all times relevant hereto employed as a Captain with the Department of the Kentucky State Police in Frankfort, Kentucky.

7.  Defendant Commonwealth of Kentucky, Justice and Public Safety Cabinet is a local government  entity located in Franklin County, Kentucky, and employer of all of the individual Defendant police officers and supervisors named herein.

8.  Defendant Department of the Kentucky State Police (hereafter "KSP") is a local government  entity located in Franklin County, Kentucky, and employer of all of the individual Defendant police officers and supervisors named herein.

## JURISDICTION AND VENUE

9.  Plaintiff incorporates by reference, as if set forth fully herein, each and every averment, allegation and statement contained in all previous paragraphs of this Complaint.

10. Plaintiff's claims fall within the subject-matter jurisdiction of this Court.

11. Plaintiff's claims for damages exceed the jurisdictional minimum of this Court.

5

12. Venue is proper because the events giving rise to this action took place in the city of Paris in Bourbon County, Kentucky.

## FACTS

13. Plaintiff incorporates by reference, as if set forth fully herein, each and every averment, allegation and statement contained in all previous paragraphs of this Complaint.

14. Trooper Gabriel is no stranger to unnecessary force and vulgar language. The facts are as follows.

15. On November 15, 2019 Mr. Dumphord was attending a football game in Richmond, Kentucky. He was headed to Lee Jones residence, who resides at 1455 Main Street, Paris, KY 40361 with his girlfriend Barbara Gross.

16. Mr. Dumphord entered Bourbon County and was traveling on Main Street. Mr. Dumphord was driving a red Ford Expedition. The same vehicle, trooper Gabriel conducted an illegal search of on June 06, 2017.

17. Trooper Gabriel's goal for the night was to look for drunk drivers. Trooper Gabriel was parked in the J & M Liquor store parking lot. Unbeknownst to Mr. Dumphord as he passed J&M liquors, trooper Gabriel was in his vehicle and had pulled out onto main street behind him.

18. During this time trooper Gabriel completes a license plate check of Mr. Dumphord's car. Mr. Dumphord's vehicle registration was up to date. His license was not expired. The car was not stolen.

19. Trooper Gabriel knew he was behind Brian Todd Dumphord. He knew Mr. Dumphord's prior criminal record. Mr. Dumphord did not know trooper Gabriel was behind him.

"During this initial time, he was behind Mr. Dumphord he had no reason to stop Mr. Dumphord, and no reason to believe Mr. Dumphord had did anything criminal."

20. Mr. Dumphord was driving normally. He was not speeding or swerving. As Mr. Dumphord continues driving down Main Street he passed approximately 4 to 5 establishments on Main Street.

21. Mr. Dumphord uses his turn signal and appropriately moves over into the compulsory turn lane in front of Bluegrass liquor. His vehicle is located straight within the yellow compulsory turn lane. After several oncoming cars pass, Mr. Dumphord then turned left into Bluegrass Liquor.

22. Trooper Gabriel had no idea why Mr. Dumphord was at Bluegrass Liquor. He did not know if Mr. Dumphord was there to purchase a drink or get change. Or place a phone call or answer a text message. He does not know any other reason why Mr. Dumphord would have turned into Bluegrass Liquor. He never asked why Mr. Dumphord was at Bluegrass liquor.

23. After, Mr. Dumphord turned into Blugrass liquor, trooper Gabriel drove down to the Shell's Gas Station and conducted a U-turn to come back toward where he last observed Mr. Dumphord on Main street.

24. Mr. Dumphord leaves Bluegrass liquor and is headed North on Main Street. Mr. Dumphord passes trooper Gabriel. Mr. Dumphord still does not know it is trooper Gabriel; however, trooper Gabriel knows it is Mr. Dumphord.

25. Mr. Dumphord arrives at 1455 Main Street, Paris, KY 40361and turns left onto Boone Street. Trooper Gabriel then starts to make another U-turn out of view of Mr. Dumphord.

7

Trooper Gabriel did not see Mr. Dumphord turn onto Boone Street and Mr. Dumphord did not see trooper Gabriel conducting a U-turn.

26. In order to make room for oncoming traffic Mr. Dumphord then parked on the sidewalk on Boone Street on the side of Mr. Jones residence. KRS 189.450. Trooper Gabriel did not observe Mr. Dumphord parking.

27. There was not a no parking sign. Lee or Barbara did not call the police and say that Mr. Dumphord was trespassing. Lee or Barbara did not come out and complain how Mr. Dumphord was parked or say that Mr. Dumphord was trespassing.

28. After parking Mr. Dumphord turned off the ignition, grabbed his keys and wallet. He opened his car door, and his foot was out of the car while he searches for his phone in between the car seats. Mr. Dumphord did not immediately exit his vehicle.

29. It was at night. Mr. Dumphord was on the corner of Boone Street, there was a streetlight. There was no nearby field.

30. Meanwhile, trooper Gabriel pulls in behind Mr. Dumphord without signaling his lights or sirens. Trooper Gabriel did not want Mr. Dumphord to know he had pulled in behind Mr. Dumphord.

31. At this point in time trooper Gabriel had already run Mr. Dumphord's license plate through his system. Mr. Dumphord's vehicle was properly registered and it wasn't stolen. Trooper Gabriel had not received any communication from dispatch alleging that Mr. Dumphord or somebody fitting his description had just committed a felony or misdemeanor. He did not receive a report to be on the lookout for a red SUV.

32. Trooper Gabriel did not receive any communication from dispatch saying that Mr. Dumphord was involved in a domestic dispute or committed a robbery. He did not get any calls from dispatch that night.

33. Trooper Gabriel quickly walks up to Mr. Dumphord's car and slammed the door on Mr. Dumphord's foot and yelled for Mr. Dumphord to get back in the car.

34. Trooper Gabriel tells Mr. Dumphord several times "you thought I were going to let you get away." Mr. Dumphord's car window had been down about an inch or two. Eventually Mr. Dumphord realized that it was trooper Gabriel. Trooper Gabriel did not observe Mr. Dumphord committing any felony or misdemeanor.

35. Trooper Gabriel did not smell the odor of alcohol or marijuana coming off Mr. Dumphords breath or out of his car. Mr. Dumphord's eyes were not blood-shot red. Trooper Gabriel did not give Mr. Dumphord any field sobriety tests. Trooper Gabriel did not ask Mr. Dumphord for a blood sample. He did not believe Mr. Dumphord was intoxicated or under the influence of anything.

36. Trooper Gabriel did not frisk Mr. Dumphord. He did not believe that Mr. Dumphord was armed and dangerous. Mr. Dumphord did not give any indication that he was armed and dangerous. Trooper Gabriel was not proceeding off of any information that Mr. Dumphord was armed and dangerous.

37. After trooper Gabriel shut Mr. Dumphord's car door on his foot, Mr. Dumphord asked trooper Gabriel what was the problem and why was he harassing him.

38. Trooper Gabriel ignored Mr. Dumphord's question and told Mr. Dumphord to provide his license and registration. While Mr. Dumphord was collecting his license and registration, he asked trooper Gabriel why he was stopping him.

39. Trooper Gabriel stated that he was illegally parked, and he was going to complete a courtesy warning. He told Mr. Dumphord to not move and to stay put. Trooper Gabriel advised him that he would also check his license status and he would be on his way shortly.

40. After collecting Mr. Dumphord's license and insurance Trooper Gabriel heads back to his vehicle. He calls dispatch to advise them that he was on a traffic stop, gave them his location, the license plate number of the vehicle, the driver's license number for Mr. Dumphord.

41. Dispatch confirmed there were no issues with Mr. Dumphord's driver's license. His insurance was up to date and he did not have any warrants.

42. He then calls for Trooper Kenny and begins the courtesy warning. Prior to trooper Kenny's arrival and while completing the warning trooper Gabriel decided to stop doing the warning and search for drugs. Trooper Gabriel told Mr. Dumphord he was giving him a warning in order to stall and wait for Trooper Kenny because that is a technique they use. Trooper Gabriel had concluded his field sobriety investigation. His purpose then shifted to a new and different purpose.

43. Although he knew at that time that Mr. Dumphord's license was fine, there were no warrants, that Mr. Dumphord had not committed any crime— as in a felony or a misdemeanor— that Mr. Dumphord wasn't intoxicated. Gabriel deferred the issuance of the warning in order to wait for Kenny and conduct a sniff search. At this time any further detention is no longer an unlawful seizure but an unlawful arrest.

44. Trooper Gabriel came back and tossed Mr. Dumphord's license and registration through the top of Mr. Dumphord's window. Gabriel asked Mr. Dumphord if there was anything

in his vehicle and Mr. Dumphord replied no there was not. Trooper Gabriel then asked
Mr. Dumphord if he could search Mr. Dumphord's vehicle and he said no.

45. Trooper Gabriel states "we about to fuck you up." At this same time trooper Kenny
arrives at the scene without his lights and without sirens.

46. Trooper Gabriel steps back to speak with Trooper Kenny and they approach Mr.
Dumphord. Trooper Gabriel orders Mr. Dumphord to "step out of the fucking car and
swings the car door open." He pulled Mr. Dumphord out of the car and slams him up
against the car.

47. As Mr. Dumphord was being pulled out, he asked Trooper Gabriel multiple times why
was he doing this to him? As Mr. Dumphord is fully out of the car, both trooper Gabriel
and Kenny slam Mr. Dumphord up against his car.

48. Trooper Gabriel is putting his hands around Mr. Dumphord's neck choking him. Trooper
Gabriel tells Mr. Dumphord they were going to pat him down and search his car.

49. At this point Mr. Dumphord feared for his life because he didn't understand how a
warning for a traffic stop turned into trooper Gabriel choking him.

50. Mr. Dumphord immediately began thinking about his wife and children. Mr. Dumphord
thought he was going to be killed like so many other black people during routine traffic
stops.

51.  Trooper Gabriel had made it clear that he had no intentions on letting Mr. Dumphord go
with just a warning as he first stated. Mr. Dumphord knew that trooper Gabriel truly
meant what he said, which was I am going to "fuck you up."

52. Nothing had occurred from the time trooper Gabriel first approached Mr. Dumphord and
chose not to pat down Mr. Dumphord, until now. The only thing that occurred was

trooper Gabriel deciding to deploy Pluto to conduct a drug sniff. Mr. Dumphord remained calm, cool, and composed. He was cooperative and not disrespectful.

53. Trooper Gabriel starts frisking Mr. Dumphord on the public corner. The search was intrusive, invasive and embarrassing and violated Mr. Dumphord's individual liberty interest. There were no articulable facts to reasonably believe that Mr. Dumphord was armed and dangerous.

54. When patting down Mr. Dumphord he initially came across the front of Mr. Dumphord's waist, patted his outer clothing and around his back.

55. The pat down did not reveal any weapons. He never alerted to feeling a weapon and never communicated to trooper Kenny that he felt a weapon or that Mr. Dumphord was armed and dangerous.

56. Mr. Dumphord was not armed and dangerous and they never found a weapon. Trooper Gabriel pulled Mr. Dumphord over before and knows that he is not known to carry weapons. Mr. Dumphord has no history of weapons charges.

57. During the pat down trooper Kenny told Mr. Dumphord "*you need to stop or you're gonna get hurt.*" Mr. Dumphord was only asking why they were being so aggressive and doing this to him. He was not being aggressive but was being cooperative.

58. Trooper Gabriel then pats Mr. Dumphord's left foot and started up, one hand on the outside of Mr. Dumphord's leg, one hand on the inside of Mr. Dumphord's left leg. He then feels in Mr. Dumphord's crotch and around his genitals.

59. Trooper Gabriel then claims he felt drugs and the troopers pinned Mr. Dumphord against the vehicle. Mr. Dumphord is not able to breathe from the pressure.

60. Further proof that trooper Gabriel and Kenny were the aggressors comes from trooper

    Gabriel's on words. On December 03, 2019 trooper Gabriel told the Grand Jury:

    "Due to the fact that I've been assaulted before, kinda as soon as I feel it they know I've
    hit it, and it kinda turns into fight or flight at that point. I've been assaulted after feeling it,
    I've had people run. Uhm *so we kinda pushed him up against the vehicle* and told him,
    which he knew, that uhm— you know I felt something in his pants, go ahead and put your
    hands behind your back, we're going to detain you."

61. Trooper Gabriel claims that they "kinda pushed him up against the vehicle" after feeling

    an anomaly. It was not a push and it was not after feeling an anomaly. They forcefully

    slammed Mr. Dumphord up against his car and choked him, leaving him gasping for air.

62. Trooper Gabriel and trooper Kenny tell Mr. Dumphord he is under arrest. Neither trooper

    informed Mr. Dumphord what he was being arrested for.

63. An arresting officer has the duty to inform the accused of his intention to arrest him and

    of the offense charged against him, and if the officer fails to do so the person about to be

    arrested may resist, unless he has knowledge of the warrant for his arrest.   (Annotation

    from former CrC 39.) *Johnson v. Com.*, 240 Ky. 337, 42 S.W.2d 341 (Ky. 1931).

64. Person need not submit to arrest unless officer informs him of his intention to arrest him

    and on what charge.   (Annotation from former CrC 39.) *McGeorge v. Com.*, 237 Ky.

    358, 35 S.W.2d 530 (Ky. 1931).

65. Trooper Gabriel and trooper Kenny grabbed a hold of Mr. Dumphord. Trooper Kenny

    attempts to body slam Mr. Dumphord to the ground but falls to the ground taking Mr.

    Dumphord to the ground with him.

66. Upon information and belief, Mr. Dumphord is twenty (20) pounds lighter than both

    trooper Kenny and trooper Gabriel. Mr. Dumphord is shorter than trooper Gabriel and

    about the same height as trooper Kenny.

67. Trooper Kenny has Mr. Dumphord wrapped in his arms and has his legs wrapped around Mr. Dumphord. At this time Mr. Dumphord was in the grasp of trooper Kenny, subdued and not resisting.

68. Then trooper Gabriel instructs Kenny "to stop, he says let go of him, let go of him Kenny." Because trooper Gabriel had already pressed the release button on his belt and released Canine Pluto from his vehicle.

69. As Pluto jumped out of the vehicle trooper Gabriel began commanding Pluto to attack Mr. Dumphord. Instead of peacefully subduing Mr. Dumphord while trooper Kenny had Mr. Dumphord subdued on the ground, trooper Gabriel releases his Canine.

70. Simply put, trooper Kenny had Mr. Dumphord subdued and trooper Gabriel was standing there making no effort to subdue Mr. Dumphord. The use of the Canine was wholly excessive and unnecessary. The warrior mindset is to escalate and use excessive force.

71. This is improper training or execution of the training or both. Trooper Kenny had Mr. Dumphord subdued. Mr. Dumphord was not fighting back. He was not armed. He was not dangerous. He was not resisting. He was not doing anything except being under submission. He was not combative. He did not attempt at any time to hit or strike either trooper.

72. Trooper Kenny let go of Mr. Dumphord and Pluto came charging at Mr. Dumphord.

73. According to trooper Gabriel, trooper Kenny had a grip on Mr. Dumphord's jacket and Mr. Dumphord slipped out of the jacket.

74. In the use of force report, which was prepared 12/05/19, it alleged that "Trooper Kenny attempted to restrain Mr. Dumphord, but he slipped out of his jacket and began to flee south from Boone Street." This simply is not true.

14

75. Trooper Kenny testified that he did not recall holding onto a thick jacket while he was on the ground. Trooper Kenny denied that he had a grip of Mr. Dumphord's jacket and that Mr. Dumphord slipped through his jacket and ran.

76. Upon seeing Pluto charging at him and hearing trooper Gabriel command Pluto to attack Mr. Dumphord, Mr. Dumphord's natural instincts and desire to survive kicked in and he started to run to get away from the dog. However, Mr. Dumphord fell as he turned to run.

77. Simply put, Mr. Dumphord had not resisted. Mr. Dumphord had not verbally threatened the officers. Mr. Dumphord was not armed and dangerous. Mr. Dumphord did not physically attack either officer. Mr. Dumphord did not attempt to flee, before the deployment of Pluto.

78. When Mr. Dumphord tripped and fell, Canine Pluto immediately started biting him. Mr. Dumphord was again subdued but this time by Pluto. Pluto is viciously biting Mr. Dumphord and he is still not resisting. He's screaming get the dog off me.

79. Trooper Gabriel then shoots and hits Mr. Dumphord with his taser/stun gun. At which point Pluto is taken off the bite and Mr. Dumphord is actually shocked with the taser.

80. At this point Mr. Dumphord blacks out but the beating does not stop. According to Trooper Kenny, trooper Gabriel then drops his taser and starts to use his ASP (baton) and delivers a few strikes to Mr. Dumphord.

81. Kenny was standing there watching and looking for a spot to tase Mr. Dumphord. Trooper Kenny did not attempt to intervene or protect Mr. Dumphord.

82. When Mr, Dumphord regains consciousness, Trooper Gabriel was striking Mr. Dumphord with his baton. Mr. Dumphord puts his hands up, clearly indicating he was not resisting, compliant and keeping his head from receiving further blows.

83. However, Pluto who had been taken off of Mr. Dumphord was commanded to attack
again to "let Pluto get him again". With Mr. Dumphord's arms stretched Pluto bites Mr.
Dumphord on his wrist and snaps Mr. Dumphord's wrist.

84. Trooper Gabriel was repeatedly telling Pluto "get him boy." Upon information and belief
several witnesses heard this.

85. Pluto has one arm and stretching Mr. Dumphord out. Trooper Gabriel is striking Mr.
Dumphord with the baton and trooper Kenny deploys his taser. Pluto is taken off the bite
again.

86. Trooper Kenny then proceeds to actually tase Mr. Dumphord, twice. Trooper Kenny then
drops his taser and begins striking Mr. Dumphord with his baton. While this was
happening Mr. Dumphord heard Officer Gabriel say "I told you I was going to fuck you
up."

87. After the tasing and baton beaten, Pluto was commanded to attack Mr. Dumphord one
last time and Mr. Dumphord was placed in handcuffs while Pluto is biting him.

88. Prior to the handcuffs being placed on him, Mr. Dumphord repeatedly let both troopers
know that Canine Pluto bit his wrist and he couldn't move it. Mr. Dumphord complained
to trooper Gabriel and trooper Kenny that the handcuffs were too tight. They ignored his
pleas of pain and put the cuffs on tightly around both his wrist.

89. After Mr. Dumphord was placed in handcuffs trooper Gabriel was working on getting
Pluto off of Mr. Dumphord. After Trooper Gabriel gets Pluto off and gets Mr. Dumphord
up off the ground, they placed Mr. Dumphord on the sidewalk. They did not walk far
because the incident occurred near the cars.

90. Mr. Dumphord set on the side of the curb, in handcuffs, bleeding profusely, and in agony. The troopers were walking around the scene and mocking Mr. Dumphord. Telling him to shut up, he wasn't hurt and he'll be fine.

91. Upon information and belief, during the course of the incident, trooper Gabriela and trooper Kenny called off the Paris Police Department.

92. Mr. Dumphord arrived at Bourbon County Community Hospital at 10:53. He was handcuffed to the hospital bed and his pleas to the troopers that his wrist was broken were ignored. Additional swelling and possible nerve and bone damage occurred to his wrist as a result of the handcuffs.

93. When transporting Mr. Dumphord they placed him in the cruiser along-side Canine Pluto.

94. Trooper Gabriel and trooper Kenny did not have reasonable grounds for making the arrest and used more force than necessary. Even if the trooper's had reasonable grounds for making the arrest, both used more force than was necessary. Trooper Gabriel and trooper Kenny used more force than necessary in effectuating the arrest and there were, in fact, no reasonable grounds for the arrest.

95. The allege crime trooper Gabriel was investigating and giving Mr. Dumphord a warning for was a parking violation. Mr. Dumphord did not pose an immediate threat to the safety of the officers or others and he was not actively resisting arrest or attempting to evade arrest by flight.

96. On December 03, 2019 Trooper Gabriel testified in front of a Bourbon County Grand Jury. On December 03, 2019 Mr. Dumphord was charged with trafficking 1st degree, second or greater offense, tampering with physical evidence, assault 3rd degree, resisting

arrest and fleeing or evading police, second degree. On June 30, 2020 Bourbon County

Circuit Judge Brian Privett held a suppression hearing.

97. Trooper Gabriel and trooper Kenny have blatantly giving false accounts of the incident to

cover up their misconduct. On January 20, 2020 the internal affairs investigation report

held:

*Trooper Gabriel advised that Canine Pluto was never taken off the bite and then allowed to re-bite Mr. Dumphord*, nor were he or Trooper Kenny ever laughing at any time during the incident. ***Trooper Gabriel advised that Canine Pluto was on the bite for the entire incident until Mr. Dumphord was in custody***, *at which time he took Canine Pluto off the bite and returned him to his vehicle. Trooper Gabriel advised that he never saw Canine Pluto bite Mr. Dumphord on the wrist or arm, only on the leg.*

***In regards to Mr. Dumphord claiming that Canine Pluto [bit his] arm causing it to break, Trooper Gabriel advised Canine Pluto did not bite Mr. Dumphord's arm.*** Trooper Gabriel said that if Mr. Dumphord's arm was hurt, *that could have happened when* he fell to the ground with Trooper Kenny or when *Trooper Gabriel had to deliver ASP strikes to Mr. Dumphord's arm to try to get him to show his hands.* Trooper Gabriel said Mr. Dumphord never complained of arm pain while he was with him.

98. According to trooper Kennny "*I never saw the dog release Mr. Dumphord's leg.*"

99. Mr. Dumphord's injuries and the pictures illustrate the truth.

## INJURIES AND MEDICAL TREATMENT

100.      Pictures of Mr. Dumphord's injuries from Canine Pluto's bite(s) to his leg are

attached as exhibit 1. Pictures of Mr. Dumphord's injuries from Canine Pluto's bite to his

wrist are attached as exhibit 2. Pictures of Mr. Dumphord's injuries from Canine Pluto's

bite to his side/back are attached as exhibit 3.

101.      Pictures of bruising on his head and shoulder from the baton are attached as

exhibit 4. Pictures of a scratch(s) around Mr. Dumphord's neck is attached as exhibit 5.

Pictures of injuries from the taser deployments are attached as exhibit 6.

102.     On November 15, 2019, Mr. Dumphord was transported to the Bourbon

Community Hospital by ambulance. While at the hospital, Mr. Dumphord was attended

to by Dr. Sandra F. Geile, MD. (Exhibit 7). Hospital staff found:

Mr. Dumphord to have laceration injuries to his left leg, chest, and back, along with six (6) puncture wounds in his anterior and posterior chest that appeared to be from taser deployments. *The laceration to Mr. Dumphord's thigh was a 6 cm laceration that cut all the way down to the muscle*. On Mr. Dumphord's inner left thigh was a 2.5 cm irregular laceration; and 1 cm laceration was found on Mr. Dumphord's left posterior thigh.

The wounds located on Mr. Dumphord's left anterior, medial, and posterior thigh were irrigated with a Hibiclens solution by hospital staff. *Gross contamination, like the kind that would be secondary to a dog bite, was identified in the process*. To close his wounds, Mr. Dumphord received stitches subsequent to the injuries being cleaned. Additionally, two (2) Penrose drains were installed on Mr. Dumphord's thigh. While at the Hospital, Mr. Dumphord was given ibuprofen and lidocaine injections for pain. Mr. Dumphord was prescribed Augmentin and then discharged to police custody. Mr. Dumphord received no care for the injuries to his wrist.

103.     Mr. Dumphord was handcuffed to the hospital bed. The handcuff was on the

broken wrist. No imaging was performed. Mr. Dumphord told the doctor over and over

his wrist was broken.

104.     At all times pertinent hereto, the Defendant Sandra F. Geile, M.D., was a duly

licensed physician engaged in the practice of medicine in the Commonwealth of Kentucky.

105.     At all times pertinent hereto, the Defendant, Bourbon Community Hospital, LLC

was a foriegn corporation which was licensed and authorized to do business within the

Commonwealth of Kentucky, and it has designated CT Corporation System as its agent for

service of process upon it.

106.     At all times pertinent hereto, the Defendant, Bourbon Community Hospital, LLC

owned, operated, and/or managed Bourbon Community Hospital located at 9 Linville

Drive, Paris, KY 40361.

107.     On November 16, 2019, less that 24 hours later, and after being released from jail,

Mr. Dumphord presented to the UK Hospital's Emergency Department, where he was

seen to by Dr. Jonathan Bronner, MD. (Collective Exhibit 8).

At this visit, Mr. Dumphord  complained of pain in his left wrist and pain to anterior left
thigh. Mr. Dumphord reported being bitten by a police dog along his left forearm, right
flank, and left thigh the night prior. Mr. Dumphord informed Emergency Department staff
that he was seen last night at the Bourbon Community Hospital; and, up until this point, he
had only received a shot of antibiotics, some Advil, and a tetanus shot.  The Bourbon
Community Hospital had not done any imaging of Mr. Dumphord's wrist/forearm prior to
discharging him.

Mr. Dumphord reported that the wounds on his anterior thigh were sutured and a dressing
was currently in place. Mr. Dumphord also reported that the pain in his left lower extremity
is bothering him and it was difficult for him to bear weight on it. Mr. Dumphord denied
any foul-smelling or purulent drainage from the puncture  wounds to his wrist or lacerations
to his thigh.

108.     At this visit, Mr. Dumphord was observed to have *swelling of the dorsum of the*

*left hand, **puncture wounds along the dorsal left forearm or wrist**, significant* wounds

noted to left thigh that have been sutured, and two (2) Penrose drains installed. No

purulent or foul-smelling drainage was noted coming from Mr. Dumphord's wounds to

his thigh or wrist. *Imaging was performed on his left hand, wrist and forearm that*

*reveled the impacted and displaced fracture.* Mr. Dumphord receive IV fluids and the

Orthopedics Department was consulted about the fracture.

109.     At the Orthopedic consultation, Mr. Dumphord's chief complaint was of a dog

bite and he continued to have wrist pain and some minimal drainage from the puncture

site, so he presented to UK ED for evaluation.

110.     Mr. Dumphord was prescribed Augmentin and had his wrist splinted. Prior to

discharge, Mr. Dumphord was instructed to make follow-up appointments with the

Orthopedics department regarding his wrist and the Plastic surgery department regarding

removal of his Penrose drains. Mr. Dumphord was diagnosed with dog bites to his left anterior thigh and left ulnar fracture. Mr. Dumphord had to have surgery on his wrist.

111.     On November 20, 2019, Mr. Dumphord presented to the Plastic Surgery Division of UK Hospital for a follow-up visit regarding a Penrose drain installed in his left thigh that had fallen out. (Collective exhibit 9). At this visit, Mr. Dumphord had one (1) Penrose drain removed and was instructed to continue his antibiotics and perform daily changes of the dressing on his left thigh. Documentation from this visit reflects that Mr. Dumphord had previously been seen by the Emergency Department on November 16, 2020 *after being bitten by a police dog on multiple areas.*

112.     At this visit, Dr. Bronner preformed a physical exam of Mr. Dumphord. From that physical exam, *Dr. Bronner notes that there was swelling of the dorsum of Mr. Dumphord's left hand; puncture wounds along his dorsal left forearm/wrist; significant wounds to his left thigh, with one such wound even measuring approximately 6 cm despite having sutures in place.* Mr. Dumphord also underwent imaging of his left hand, wrist, and forearm. That imaging revealed an impacted/displaced fracture of Mr. Dumphord's left distal Ulna.

113.     On November 22, 2019, Mr. Dumphord was seen by the Emergency Department at UK Hospital with a chief complaint of low-back pain. (Collective exhibit 8). Mr. Dumphord's reported that he had been experiencing pain radiating from his lower back and into his legs and calves for one (1) week. Mr. Dumphord reported exacerbation of his pain after an altercation with police where he was bitten in his legs by dogs and tasered multiple times. Mr. Dumphord also reported a tingling in his feet.

114.     Mr. Dumphord was attended to by Dr. Brian W. Adkins, MD, who prescribed Mr.

Dumphord Amoxicillin-davulante, Cyclobenzaprine, and was referred to the Orthopedic

Surgery and Sports Medicine division of UK Hospital. (Collective Exhibit 10). During

this visit, Mr. Dumphord was attended to by Dr. Brian W. Adkins, MD.  Documentation

from this visit indicates that Mr. Dumphord reported suffering from acute radiating back

pain that began after his altercation with police the Friday prior. To evaluate these

concerns, CT images were taken of Mr. Dumphord's spine.

115.     On November 27, 2019, Brian T. Dumphord presented to the UK Hospital's

Division of Orthopedic Surgery and Sports Medicine where he was examined by Dr.

Srinath Kamineni, MD. (Collective exhibit 10). Dr. Kamineni  discussed the possibility

of surgery to correct the pain Mr. Dumphord was still experiencing from the injury to his

wrist. Despite the fact that Mr. Dumphord's superficial skin wounds had healed, he was

still experiencing constant pain crepitus which was affecting his ability to get dressed,

make meals, drive, work, and sleep.

116.     Mr. Dumphord reported his visual tunnel school pain to be a 7 out of 10, with the

worst rising to the level of 10 out of 10.  Following that discussion with Dr. Kamineni,

Mr. Dumphord decided to go ahead with surgery in the hopes of lessening the pain he

was dealing with on a daily basis. Also, on this date Mr. Dumphord received a

prescription for Augmentin.

117.     Documentation from this visit reflects that Mr. Dumphord is still dealing with

constant pain crepitus, which is affecting his ability to get dressed, drive, work, make

meals, and sleep.

118.     On December 04, 2019, Mr. Dumphord presented to the Department of Plastic

Surgery to have the wound on his left thigh assessed. Mr. Dumphord reported that his

wounds had completely scabbed over, but there was still some mild drainage and he is

still experiencing altered sensation of his medial thigh. At that visit, Mr. Dumphord was

educated on how to safely break up scar tissue that had formed around his injuries.

119.     On December 30, 2019, Mr. Dumphord presented  first to the UK Hospital's

Orthopedic Surgery and Sports Medicine Department with complaints of an open wound

on his left thigh due to a dog bite and hand pain after being seen first by the Emergency

Department of the same hospital. At this visit, Mr. Dumphord was attended to by Dr.

Srinath Kamineni, MD, who discussed treatment options with him. At that December 30,

2019, Mr. Dumphord decided to proceed with operative intervention to correct a

suspected malunion in his wrist that was causing him continued pain. Prior to the surgery,

Mr. Dumphord had X-ray's taken of his wrist at the Division of Orthopedic Surgery and

Sports Medicine.

120.     For the surgery, a reduction maneuver was performed, then two (2) K-wires were

placed through Mr. Dumphord's ulnar styloid to secure the distal fragment to the

proximal segment of the Ulna. Once Dr. Kamineni had secured the distal fragment to his

satisfaction, the pin sites were prepped, wire cut, and pins put in place. Following the

procedure, X-rays were taken to confirm that the wires were stationary.

121.     On January 09, 2020, Mr. Dumphord was seen by a psychologist/psychiatrist, Dr.

Vincent Mullen, MD. (Collective exhibit 11). The history of present illness, as a result of

the November 15, 2019 incident, was increased anxiety, nightmares, insomnia,

flashbacks of recent trauma. No SI/HI, energy is slightly decreased, as is appetite.

23

Concentration is good. Avoids social situations, and has intrusive thoughts of the

incident. Mr. Dumphord was assessed to be suffering from PTSD and the plan was for

Mr. Dumphord to:

      1.  take 24rozac 10 mg by mouth qd (once daily)
      2.  take ambien 5 mg by mouth nightly @ bedtime
      3.  return to clinic in 4 weeks
      4.  reviewed r/b/e (relative biological effectiveness) including controlled substance precautions, sleep-walking, etc.
      5.  encouraged psychotherapy – patient has capacity to benefit from the treatment, reviewed, the rationale for and risks and benefits of the recommended treatment with patient or legal, guardian who expressed an understanding of, and agreed with, the recommendations.

122.      On January 14, 2020, Mr. Dumphord was seen by the Division of Orthopedic

Surgery and Sports Medicine to have his pin sites cleaned of any infection and replaced

where necessary. Mr. Dumphord also had portions of his gutter splint replaced and

received prescriptions for Gabapentin and Tizanidine at this appointment.

123.      Mr. Dumphord had a follow up assessment with Dr. Vincent Mullen MD on

January 23, 2020. States he's having flashbacks and nightmares are unchanged, mood is

better, has not SI/HI (suicidal/homicidal ideation), energy and appetite are good,

concentration is good, has been more social, going to a lot of youth sports events, sleep

has improved (thinks he's sleeping 1-2 more hours per night), getting back to his old self.

No A/VH (auditory/visual hallucinations), no problem driving except when he sees a

police car, which he said makes him panic, said it's worse when they are behind him. He

Increase eprozac to 20 mg by mouth daily, and ambien to 10mg nightly at bedtime and to

Consider prazosin next time; return to clinic in 4 weeks, call as needed.

124.      On February 12, 2020, Mr. Dumphord was seen by the Division of Orthopedic

Surgery and Sports Medicine to have his surgery site checked, the pin sites cleaned and

dressed, and begin physical therapy. At the end of the physical therapy session, Mr. Dumphord's condition was reviewed to reassess his motion and symptoms. As part of that review, imaging was done of Mr. Dumphord's wrist to assess how he is healing. On this date, Mr. Dumphord received prescriptions for Fluoxetine HCl and Zolpidem Tartrate.

125.    On February 19, 2020, Mr. Dumphord was seen by the Plastic Surgery Division of UK Hospital for a follow-up and for complaints of cramping and pain in his left leg. Mr. Dumphord was attended to by Dr. Francesca D. Beaman. Documentation from this visit reflects that Mr. Dumphord had previously been bitten by a dog on his left groin and leg. Dr. Beaman prescribed physical therapy to rehabilitate his left hip, thigh and lower leg.

126.    Subsequent to that, Brian T. Dumphord was seen at Kort physical therapy by Laura E. Williams, PT, to receive treatment for his injuries. (Collective exhibit 12). Mr. Dumphord first presented to Kort on March 11, 2020 and reported to have been bitten by a police dog on November 15, 2019, where he sustained a fracture to his L ulna. Mr. Dumphord reported that he was still making use of a removable wrist splint.

127.    At that March 11, 2020 appointment, it was recommended by Laura E. Williams, PT, that Mr. Dumphord attend rehabilitative therapy two (2) times per week for an expected duration of six (6) weeks. Mr. Dumphord also received treatment in the form of therapeutic exercises, manual intervention on joint segments, and other manual therapy techniques.

128.    On March 13, 2020, Mr. Dumphord was seen by Laura E. Williams, PT, at Kort. At this visit, Mr. Dumphord was put through a series of therapeutic activities, received

self-care/home management training, neuromuscular re-education, therapeutic

procedures, and manual therapy techniques.

129.     On March 16, 2020, Mr. Dumphord was seen by Laura E. Williams, PT, at Kort.

At this visit, Mr. Dumphord was put through a series of therapeutic activities, received

self-care/home management training, neuromuscular re-education, therapeutic

procedures, and manual therapy techniques.

130.     On April 07, 2020, Mr. Dumphord was seen by Laura E. Williams, PT, at Kort.

At this visit, Mr. Dumphord was put through a series of therapeutic activities, received

self-care/home management training, neuromuscular re-education, therapeutic

procedures, and manual therapy techniques.

131.     On April 10, 2020, Mr. Dumphord was seen by Laura E. Williams, PT, at Kort.

At this visit, Mr. Dumphord's condition was re-evaluated in addition to being put through

a series of therapeutic activities, received self-care/home management training,

neuromuscular re-education, therapeutic procedures, and manual therapy techniques.

132.     On April 13, 2020, Mr. Dumphord was seen by Laura E. Williams, PT, at Kort.

At this visit, Mr. Dumphord  was put through therapeutic procedures, therapeutic

activities, neuromuscular re-education, and manual therapy techniques.

133.     On April 16, 2020, Mr. Dumphord was seen by Laura E. Williams, PT, at Kort.

At this visit, Mr. Dumphord  was put through therapeutic procedures, therapeutic

activities, neuromuscular re-education, and manual therapy techniques.

134.     On April 23, 2020, Mr. Dumphord was seen by Laura E. Williams, PT, at Kort.

At this visit, Mr. Dumphord  was put through therapeutic procedures, therapeutic

activities, neuromuscular re-education, and manual therapy techniques.

135.     On May 06, 2020, Mr. Dumphord was seen by Laura E. Williams, PT, at Kort. At this visit, Mr. Dumphord's condition was re-evaluated in addition to receiving treatment in the form of therapeutic procedures, therapeutic activities, neuromuscular re-education, and manual therapy techniques.

136.     On May 13, 2020, Mr. Dumphord was seen by Laura E. Williams, PT, at Kort. At this visit, Mr. Dumphord was put through therapeutic procedures, therapeutic activities, neuromuscular re-education, and manual therapy techniques.

137.     On May 20, 2020, Mr. Dumphord was seen by Laura E. Williams, PT, at Kort. At this visit, Mr. Dumphord was put through therapeutic procedures, therapeutic activities, and self-care/home-management training.

138.     Mr. Dumphord continues to suffer from the injuries (physically, mentally and emotionally) and will have future medical expenses. Mr. Dumphord may have to have plastic surgery. The incident has resulted in permanent scaring. Mr. Dumphord has tingling and numbness in his toes and leg and his toes lock up. Mr. Dumphord's day to day activities and life has been altered. Mr. Dumphord was advised that he would never regain full movement of his wrist.

139.     The incident even had an effect on Mr. Dumphord's relationship with his wife.

140.     Of course, the actions of trooper Gabriel and Kenny were a product of the training, custom, practices and culture within the Department of the Kentucky State Police. The Department of the Kentucky State Police train their officers to be violent and aggressive and have a custom and culture of violent and aggressive officers. (Collective Exhibit 13).

141.     Mr. Dumphord was unlawfully stopped, searched, seized and arrested by trooper Gabriel. Mr. Dumphord was unlawfully searched, seized and arrested by trooper Kenny.

142.     The two troopers used extreme and unnecessary excessive force against Mr. Dumphord. Trooper Gabriel had on a bullet resistant vest. He had on a belt with a button he could press to unleash his K-9.

143.     Canine Pluto was commanded to viciously attack Mr. Dumphord three (3) times. Trooper Gabriel and trooper Kenny deployed their tasers on Mr. Dumphord. Mr. Dumphord was shocked multiple times by the tasers. Trooper Gabriel and trooper Kenny struck Mr. Dumphord with their batons at least five (5) to ten (10) times.

### PRIOR ENCOUNTER – HARRASSMENT & RACIALLY MOTIVATED

144.     Trooper Gabriel's first encounter with Mr. Dumphord was on June 06, 2017. Mr. Dumphord was driving a red ford expedition and was pulled over by Trooper Gabriel for failure to or improper signal pursuant to KRS 189.380.

145.     Although Mr. Dumphord was pulled over for his alleged failure to use a turn signal, Trooper Gabriel asked if he could search Mr. Dumphord's vehicle and Mr. Dumphord declined. Trooper Gabriel did not ask Mr. Dumphord for permission to do an open-air sniff around Mr. Dumphord's vehicle.

146.     Trooper Gabriel deployed his Canine Pluto to perform an open-air sniff and in doing so conducted an unlawful search of Mr. Dumphord in violation of Mr. Dumphord's constitutional rights pursuant to the 14th and 4th Amendments of the United States Constitution. Mr. Dumphord spent a day in jail as a result of the unlawful search and arrest.

147.     Trooper Gabriel completed the June 06, 2017 citation and on July 05, 2017

Trooper Gabriel testified against Mr. Dumphord at the preliminary hearing that resulting

in an indictment being returned on August 01, 2017 (17-CR-00094).

148.     On May 08, 2018, the then Commonwealth attorney, Gordon Shaw moved to

dismiss the charges against Mr. Dumphord, without Mr. Dumphord stipulating to

probable cause because the stop was unlawful.

149.     This brings us to trooper Gabriel unlawfully stopping, searching and seizing Mr.

Dumphord on November 15, 2019. Mr. Dumphord suffered serious physical and mental

trauma during the stop. As a result on November 19, 2019 he filed a complaint with

internal affairs that trooper Gabriel was harassing him, the stop and beating was revenge

and racially motivated.

150.     Captain Brad Arterburn was the Internal Affairs Branch Commander and Sergent

Dallas Greer was the supervising IA officer for KSP. On 01/20/2020 trooper Dallas Greer

releases his Memo.

151.     On 01/23/2020 Internal Affairs Branch Commander Brad Arterburn issued a

memo concurring with Trooper Dallas Greer's report and on 02/17/2020 a letter was sent

to Trooper Gabriel and Mr. Dumphord stating that there is no evidence to indicate trooper

Gabriel had violated any Kentucky State Police Standards of Conduct and that the case

has been closed.

152.     In the January 23, 2020 memo concerning the internal affairs investigation the

Kentucky State Police stated:

*Trooper Gabriel advised that he had never been the actual complaining witness for any*
*previous case involving Mr. Dumphord*, and was unaware of the courts decision with
regards to the above mentioned case. He advised that he had not followed that case,

honestly did not care what it's disposition was, *and the first he knew that the charges in that case had been dismissed were from Mr. Dumphord's complaint*.

153.      The January 23, 2020 memo went on to say:

TROOPER JACK GABRIEL & MR. BRIAN DUMPHORD'S PREVIOUS INTERACTIONS:

On Wednesday, January 15, 2020, I had Criminal Intel Analyst Gary Thomas with Vehicle Investigations conduct a criminal history search on Mr. Dumphord. *The purpose of this search was to uncover if there were any previous citations issued, arrests made, or indictments returned as a result of actions taken by Trooper Jack Gabriel against Mr. Dumphord* that would indicate a pattern of behavior by Trooper Gabriel of unlawfully targeting or racially profiling Mr. Dumphord or subjecting him to unfair treatment or intimidation that would arise to the level of police misconduct or harassment.

The *only case* within Mr. Dumphord's lengthy criminal history *in which Trooper Gabriel is a complaining witness against Mr. Dumphord is the case resulting from the incident that occurred on November 15, 2019.* This is not indicative of Trooper Gabriel unlawfully targeting or racially profiling Mr. Dumphord or subjecting him to unfair treatment or intimidation that would arise to the level of police misconduct or harassment.

154.      It's simply not true and wholly inaccurate for trooper Gabriel to report to internal affairs and for internal affairs to investigate and conclude there were no previous *citations issued, arrests made, or indictments returned as a result of actions taken by Trooper Jack Gabriel* and that trooper Gabriel *is only a complaining witness against Mr. Dumphord is the case resulting from the incident that occurred on November 15, 2019.*

155.      It is clear that on June 06, 2017 trooper Gabriel pulled Mr. Dumphord over and issued the citation, and that Trooper Gabriel testified against Mr. Dumphord on July 05, 2017 at a preliminary hearing that resulted in an indictment being returned on August 01, 2017 (17-CR-00094).

156.      Then the unlawful stop and beating Mr. Dumphord was subjected to on November 15, 2019 would indicate a pattern of behavior by Trooper Gabriel of unlawfully targeting or racially profiling Mr. Dumphord or subjecting him to unfair

treatment or intimidation that would arise to the level of police misconduct or

harassment.

157.     Moreover, on Dec 03, 2019 while testifying at the grand jury, trooper Gabriel

stated:

This report I ran the license plate of it, which I do with all the vehicles— I had done the
same with the white vehicle. I noticed that the registered owner was Brian Todd Dumphord.
*Mr. Dumphord and I have met before, I charged him— or have at least stopped him where
he was arrested for tr— possession of cocaine uh within the last few years, so I knew of his
criminal history* uhm… but Like I said, I was looking for DUI drivers at the time so I was
still kinda focused on the white vehicle.

158.     Trooper Gabriel clearly acknowledges knowing Mr. Dumphord and previously

stopping MR. Dumphord resulting in his arrest. Trooper Gabriel lies to internal affairs

and internal affairs does not properly investigate Mr. Dumphord's complaint, resulting in

further mental and emotional distress.

159.     Lastly, it is important to note that at the time of November 15, 2019 incident,

trooper Gabriel was already the subject of an internal affairs investigation. On August 03,

2019 trooper Gabriel was involved in an incident with a suspect which resulted in trooper

Gabriel being reprimanded. Trooper Gabriel was unprofessional and used vulgar

language toward the suspect who was recording the incident with his phone.

160.     Trooper Gabriel was also suspended five (5) days without pay for unlawfully

detaining Gage Slone and Elena Perez on June 09, 2020. Trooper Gabriel's application of

force was inappropriate for the situation and in violation of KSP's courtesy protocols and

appropriate conduct standards.

161.     Trooper Gabriel and trooper Kenny lied about Canine Pluto biting Mr. Dumphord

over and over and the Kentucky State Police Department actively conducted a flawed

investigation in order to cover up the racially and revenged motivated beaten and dog

attack. Moreover, Mr. Dumphord's injuries prove that they took Canine Pluto off of Mr. Dumphord and then put him back on Mr. Dumphord.

## TRAINING, CUSTOM, CULTURE AND PRACTICE

162.     Upon information and belief, as of November 15, 2019, trooper Gabriel was an eight (8) year veteran with the Department of the Kentucky State Police and received the "The Warrior Mindset" training that was a part of the culture, training practice and custom within the Kentucky State Police Department.

163.     Defendants Sergeant Sonny Dunaway, Captain Chad Mills, Department of Kentucky State Police, and Commissioner Rodney Brewer

164.     Upon information and belief, Gov. Andy Beshear's administration is conducting a top-to-bottom review of all training materials used by the state police and has discovered another PowerPoint presentation that contained similar information to the Warrior Mindset training involving the same trainer.

165.     Upon information and belief, Gov. Andy Beshear said the material was absolutely and totally unacceptable and J. Michael Brown, executive director of his cabinet, is leading the investigation.

166.     Upon information and belief, the Justice and Public Safety Cabinet continues to work diligently to swiftly and thoroughly conduct an internal review of all training materials and will provide information as it becomes available.

167.     Upon information and belief, The Warrior Mindset training was taught to cadets from 2005 until 2015.

168.     Upon information and belief, it was reported that in a deposition on October 14, 2020 Kentucky State Police Captain James Goble said that Lieutenant Curt Hall, whose

name is on the slideshow, taught "warrior mentality" trainings at the KSP Academy to
cadets from 2005 to 2015 who was later commander of internal affairs at KSP before his
recent retirement.

169.    Upon information and belief, Kentucky State Police Commissioner Rodney
Brewer has resigned from his position amid the controversy over the training presentation
that included quotes from Adolf Hitler.

170.    Upon information and belief, the training, custom and culture was for the troopers
to be "ruthlessness without anger" and to have "controlled aggression without anger" and
to be "able to meet violence with greater violence." To have a "mindset void of emotion",
where perception, analysis, and response merge into one process. To "be the loving
father, spouse, and friend as well as the ruthless killer."

171.    Upon information and belief, the training quotes Hitler, "the very first essential
for success is a perpetually constant and regular employment of violence."— Adolf Hitler

172.    Upon information and belief, this warrior training was taught for six (6) years
prior to trooper Gabriel being trained.

173.    Upon information and belief, the warrior mindset training began in 2005 and
trooper Gabriel trained around 2011.

174.    Upon information and belief, for six (6) years this warrior mindset was the
practice, custom, culture and training which was alive, thriving and rampant throughout
the Department of the Kentucky State Police.

175.    Upon information and belief, ten years (2005 through 2015) of the warrior
mindset training is not eradicated simply by not using the presentation for incoming

cadets because those who received the training for ten years were already poisoned and
embedded with the warrior mind set custom, culture, training and practice.

176.     Upon information and belief, Dr. Jack Glaser, UC Berkeley professor, worries
that the presentation "is a recipe for excessive force." "The tenor and substance of this
training is very much at odds with contemporary police efforts to improve community
relations and minimize excessive use of force," Glaser stated.

177.     Upon information and belief, nne slide titled "The Thin Gray Line" uses a quote
from Robert E. Lee and two photos of seemingly all-white groups of KSP officers in their
traditional gray uniforms. It's concerning that the Thin Gray Line slide has a quote from
Robert E. Lee, given that Lee was the Confederate commander and Confederate uniforms
were famously gray.

178.     Upon information and belief, a 2019 Florida State University Study found that
officers who had a "warrior mentality" were more supportive of excessive use of force
than those who believed in a "guardian mentality."

179.     Upon information and belief, Trooper Gabriel testified on June 30, 2020 that "the
reason I have a narcotics K9 is for this instanced where you don't have consent to search
a vehicle and we're given a tool that's not invasive at all to the vehicle to be able to
establish if there's an odor of narcotics present or not… so, you know, I'm not simply
there because of a parking complaint."

180.     Upon information and belief, defendants have trained trooper Gabriel to
unlawfully deploy Pluto when he is denied consent for a search. That this is the policy,
custom and practice of the Kentucky State Police Department.

181.     When trooper Gabriel was asked if he was out looking for intoxicated drivers,
why wouldn't he just finish the warning and then get back to looking for intoxicated
drivers, his response was: "I am currently assigned by the State Police where I'm given a
narcotics K9; that's the main focus of our entire job is to look for narcotics."

182.     Defendants Sergeant Sonny Dunaway, Captain Chad Mills, Department of
Kentucky State Police, and Commissioner Rodney Brewer are the " 'moving force' "
behind the Warrior Mindset training which resulted in the deprivation of Mr.
Dumphord's rights.

183.     The Defendants Sergeant Sonny Dunaway, Captain Chad Mills, Department of
Kentucky State Police, and Commissioner Rodney Brewer "policy or custom" by use of
the warrior mindset training played a part in the violations of federal law claimed herein.

184.     In implementing the Warrior Mindset training, the Kentucky State Police was not
acting for the purpose of preserving the peace, in the interest of public health, and in
enforcement of laws for the safety of the public.

185.     Defendants Sergeant Sonny Dunaway, Captain Chad Mills, Department of
Kentucky State Police, and Commissioner Rodney Brewer actively participated in,
encouraging or directing the commission of illegal acts by trooper Gabriel and trooper
Kenny.

186.     As a direct and proximate result of the ... unlawful and malicious physical abuse
of Plaintiff by trooper Gabriel and trooper Kenny, under the color [of] law and under
their authority as Kentucky State Police Officers, the Plaintiff suffered grievous bodily
harm and was deprived of his right to be secure in his person against unreasonable
searches and seizures of his person and his right to be free from excessive force, in

35

violation of the Fourth and Fourteenth Amendments of the Constitution of the United
States and 42 U.S.C. Section 1983.

187.     Defendants Sergeant Sonny Dunaway, supervisor to trooper Gabriel, and Captain
         Chad Mills, supervisor to Kenny was at all times relevant the supervisor with the
         Kentucky State Police with oversight responsibility for Gabriel and Kenny. Defendants
         Sergeant Sonny Dunaway, Captain Chad Mills, Department of Kentucky State Police,
         and Commissioner Rodney Brewer were responsible for training, instruction, supervision
         and discipline of Gabriel and Kenny who beat the Plaintiff.

188.     Defendants Sergeant Sonny Dunaway, Department of Kentucky State Police, and
         Commissioner Rodney Brewer received complaints about the conduct of Gabriel, and
         knew about past complaint, aberrant behavior, disciplinary infractions, or had knowledge
         that Gabriel posed a pervasive and unreasonable risk of harm to Plaintiff.

189.     It is believed that Defendants Sergeant Sonny Dunaway, Captain Chad Mills,
         Department of Kentucky State Police, and Commissioner Rodney Brewer failed to take
         preventative and remedial measures to guard against the brutality the Plaintiff suffered. If
         Defendants Sergeant Sonny Dunaway, Captain Chad Mills, Department of Kentucky
         State Police, and Commissioner Rodney Brewer had taken such remedial action, the
         beating of the Plaintiff would not have occurred.

190.     Acting under color of law and pursuant to official policy, practice, training or
         custom,  Defendants Sergeant Sonny Dunaway, Captain Chad Mills, Department of
         Kentucky State Police, and Commissioner Rodney Brewer intentionally, knowingly, and
         recklessly failed to instruct, supervise, control, and discipline, on a continuing basis,
         defendants Gabriel and Kenny in their duties to refrain from unlawfully and maliciously

assaulting and beating citizens and otherwise using unreasonable and excessive force
before, during, or after making an arrest. Amounting to a deliberate indifference to the
constitutionally protected rights of the Plaintiff.

## COUNT I

## 42 U.S.C. 1983 – UNLAWFUL STOP, ARREST AND SEIZURE IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION

191.    Plaintiff incorporates by reference, as if set forth fully herein, each and every
averment, allegation and statement contained in all previous paragraphs of this
Complaint.

192.    42 U.S.C. § 1983 provides that "Every person, who under color of any statute,
ordinance, regulation, custom or usage of any state or territory or the District of
Columbia subjects or causes to be subjected any citizen of the United States or other
person within the jurisdiction thereof to the deprivation of any rights, privileges or
immunities secured by the constitution and law shall be liable to the party injured in an
action at law, suit in equity, or other appropriate proceeding for redress…"

193.    Plaintiff is a citizen of the United States and all of the individual Defendants are
persons for purposes of 42 U.S.C. § 1983.

194.    The Fourth Amendment of the United States Constitution protects Plaintiff
against unreasonable stops, arrest, and seizures. Defendant Gabriel and Defendant Kenny
unlawfully stopped, seized and unlawfully arrested Plaintiff.

195.    At the time of the incidents giving rise to this Complaint, Plaintiff had a clearly
established constitutional right under the Fourth Amendment to be secure in his person
from unreasonable seizure through unlawful arrest.

196.    Any reasonable police officer knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

197.    Defendant Gabriel and Defendant Kenny's, unlawful arrest, and unlawful seizure of the Plaintiff, as described herein, were both objectively unreasonable in light of the facts and circumstances confronting them and violated these Fourth Amendment rights of the Plaintiff.

198.    Defendant Gabriel's and Defendant Kenny's actions, unlawful arrest, and unlawful seizure of the Plaintiff, as described herein, were also malicious and/or involved reckless, callous, and deliberate indifference to Plaintiff's federally protected rights.

199.    Defendant Gabriel and Defendant Kenny engaged in the conduct described by the Complaint willfully, maliciously, in bad faith, and in reckless disregard of the Plaintiff's federally protected constitutional rights.

200.    They did so with shocking and willful indifference to Plaintiff's rights and their conscious awareness that they would cause Plaintiff injury.

201.    According to trooper Gabriel parking on the sidewalk is not a dangerous crime and troopers do not have an interest in prosecuting people who park on the sidewalk. People parking on the sidewalk is not a crime that trooper Gabriel is not trying to prevent people from doing.

202.    Trooper Gabriel and trooper Kenny, at all times relevant hereto, were acting under the color of state law in their capacity as Department of Kentucky State Police officers and their acts or omissions were conducted within the scope of their official duties or employment.

38

203.    These individual Defendants are not entitled to qualified immunity for the

complained of conduct.

204.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has

suffered injury and damages.

205.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has

suffered injury and damages. Defendants Sergeant Sonny Dunaway, Captain Chad Mills,

Department of Kentucky State Police, and Commissioner Rodney Brewer are also liable

under the doctrine of *respondeat superior*.

206.    Defendants Sergeant Sonny Dunaway, Captain Chad Mills, Department of

Kentucky State Police, and Commissioner Rodney Brewer are also liable improper

training, hiring, practices, custom and supervising.

## COUNT II

**42 U.S.C. 1983 -- UNREASONABLE SEARCH IN VIOLATION OF THE FOURTH AND
FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION**

207.    Plaintiff incorporates by reference, as if set forth fully herein, each and every

averment, allegation and statement contained in all previous paragraphs of this

Complaint.

208.    The Fourth Amendment of the United States Constitution protects Plaintiff

against unreasonable searches.

209.    Defendant trooper Gabriel and Defendant Kenny, at all times relevant hereto,

were acting under the color of state law in their capacity as Department of Kentucky

State Police officers and their acts or omissions were conducted within the scope of their

official duties or employment.

210.     At the time of the incidents giving rise to this Complaint, Plaintiff had a clearly
established constitutional right under the Fourth Amendment to be secure in his person
from unreasonable searches.

211.     Any reasonable police officer knew or should have known of these rights at the
time of the complained of conduct as they were clearly established at that time.

212.     Defendant Gabriel and Defendant Kenny, unlawfully searched the Plaintiff, as
described herein, were both objectively unreasonable in light of the facts and
circumstances confronting them and violated these Fourth Amendment rights of the
Plaintiff.

213.     Defendant Gabriel's and Defendant Kenny's actions, unlawful search of the
Plaintiff, as described herein, was also malicious and/or involved reckless, callous, and
deliberate indifference to Plaintiff's federally protected rights.

214.     Defendant officers engaged in the conduct described by the Complaint willfully,
maliciously, in bad faith, and in reckless disregard of the Plaintiff's federally protected
constitutional rights.

215.     They did so with shocking and willful indifference to Plaintiff's rights and their
conscious awareness that they would cause Plaintiff injury.

216.     Defendant Gabriel and Defendant Kenny unlawfully seized and unlawfully
arrested Plaintiff.

217.     These individual Defendants are not entitled to qualified immunity for the
complained of conduct.

218.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has
suffered injury and damages.

219.     Defendant Gabriel and Defendant Kenny searched Plaintiff's person and vehicle

without his implied or explicit consent and without probable cause to perform the search.

220.     By searching the Plaintiff without consent or probable cause, Defendant Gabriel

and Defendant Kenny violated Plaintiff's Fourth Amendment right to be free from an

unreasonable search and seizure.

221.     Defendants' unreasonable search resulted in the unreasonable seizure of Plaintiff.

222.     Plaintiff was deprived of his protected constitutional rights which were violated

by the negligent and unreasonable actions of Defendant Gabriel and Defendant Kenny.

223.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has

suffered injury and damages. Defendants Sergeant Sonny Dunaway, Captain Chad Mills,

Department of Kentucky State Police, and Commissioner Rodney Brewer are also liable

under the doctrine of *respondeat superior*.

224.     Defendants Sergeant Sonny Dunaway, Captain Chad Mills, Department of

Kentucky State Police, and Commissioner Rodney Brewer are also liable improper

training, hiring, practices, custom and supervising.

## COUNT III

### 42 U.S.C. 1983 – EXCESSIVE FORCE - CANINE

225.     Plaintiff incorporates by reference, as if set forth fully herein, each and every

averment, allegation and statement contained in all previous paragraphs of this

Complaint.

226.     Defendant Gabriel and Defendant Kenny acted with malice, negligence, and/or a

primary purpose other than that of bringing an offender to justice and/or involved

reckless, callous, and deliberate indifference.

41

227.     Defendant officers engaged in the conduct described by the Complaint willfully, maliciously, in bad faith, and in reckless disregard of the Plaintiff's federally protected constitutional rights.

228.     They did so with shocking and willful indifference to Plaintiff's rights and their conscious awareness that they would cause Plaintiff injury. These individual Defendants are not entitled to qualified immunity for the complained of conduct.

229.     Any reasonable police officer knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time. *Rainey v. Patton*, 534 Fed.Appx. 391, 197 (6th Cir. 2013).

230.     Trooper Gabriel and trooper Kenny each are therefore liable for the damages resulting from the Excessive use of Canine Pluto.

231.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered injury and damages. Defendants Sergeant Sonny Dunaway, Captain Chad Mills, Department of Kentucky State Police, and Commissioner Rodney Brewer are also liable under the doctrine of *respondeat superior*.

232.     Defendants Sergeant Sonny Dunaway, Captain Chad Mills, Department of Kentucky State Police, and Commissioner Rodney Brewer are also liable improper training, hiring, practices, custom and supervising.

233.     Trooper Kenny had the opportunity to prevent such use of force and did not. Trooper Kenny observed trooper Gabriel use excessive force and should have known trooper Gabriel was using excessive force. Trooper Kenny is liable for the resulting injuries for his failure to intervene and protect Mr. Dumphord.

## COUNT IV

## 42  U.S.C. 1983 – EXCESSIVE FORCE – TASERS

234.     Plaintiff incorporates by reference, as if set forth fully herein, each and every

averment, allegation and statement contained in all previous paragraphs of this

Complaint.

235.     Defendant Gabriel and Defendant Kenny acted with malice, negligence, and/or a

primary purpose other than that of bringing an offender to justice and/or involved

reckless, callous, and deliberate indifference.

236.     Defendant officers engaged in the conduct described by the Complaint willfully,

maliciously, in bad faith, and in reckless disregard of the Plaintiff's federally protected

constitutional rights.

237.     They did so with shocking and willful indifference to Plaintiff's rights and their

conscious awareness that they would cause Plaintiff injury. These individual Defendants

are not entitled to qualified immunity for the complained of conduct.

238.     Any reasonable police officer knew or should have known of these rights at the

time of the complained of conduct as they were clearly established at that time. The use

of the tasers and the continued gratuitous and excessive use of the tasers violates clearly

established constitutional right. *Landis v Baker*, 297 Fed.Appx. (6th Cir.2008).

239.     Mr. Dumphord did not actively resist or refuse to be handcuffed. Mr. Dumphord

had the right to be free from physical force when he was not resisting and at several

stages illustrated ceased resistance.

240.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has

suffered injury and damages. Defendants Sergeant Sonny Dunaway, Captain Chad Mills,

Department of Kentucky State Police, and Commissioner Rodney Brewer are also liable under the doctrine of *respondeat superior*.

241.     Defendants Sergeant Sonny Dunaway, Captain Chad Mills, Department of Kentucky State Police, and Commissioner Rodney Brewer are also liable improper training, hiring, practices, custom and supervising.

242.     Trooper Kenny had the opportunity to prevent such use of force and did not. Trooper Kenny observed trooper Gabriel use excessive force and should have known trooper Gabriel was using excessive force. Trooper Kenny is liable for the resulting injuries for his failure to intervene and protect Mr. Dumphord.

### COUNT V

### 42  U.S.C. 1983 – EXCESSIVE FORCE - BATON

243.     Plaintiff incorporates by reference, as if set forth fully herein, each and every averment, allegation and statement contained in all previous paragraphs of this Complaint.

244.     Defendant Gabriel and Defendant Kenny acted with malice, negligence, and/or a primary purpose other than that of bringing an offender to justice and/or involved reckless, callous, and deliberate indifference.

245.     Defendant officers engaged in the conduct described by the Complaint willfully, maliciously, in bad faith, and in reckless disregard of the Plaintiff's federally protected constitutional rights.

246.     They did so with shocking and willful indifference to Plaintiff's rights and their conscious awareness that they would cause Plaintiff injury. These individual Defendants are not entitled to qualified immunity for the complained of conduct.

247.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has

suffered injury and damages. Defendants Sergeant Sonny Dunaway, Captain Chad Mills,

Department of Kentucky State Police, and Commissioner Rodney Brewer are also liable

under the doctrine of *respondeat superior*.

248.    Defendants Sergeant Sonny Dunaway, Captain Chad Mills, Department of

Kentucky State Police, and Commissioner Rodney Brewer are also liable improper

training, hiring, practices, custom and supervising.

249.    Trooper Kenny had the opportunity to prevent such use of force and did not.

Trooper Kenny observed trooper Gabriel use excessive force and should have known

trooper Gabriel was using excessive force. Trooper Kenny is liable for the resulting

injuries for his failure to intervene and protect Mr. Dumphord.

250.    Any reasonable police officer knew or should have known of these rights at the

time of the complained of conduct as they were clearly established at that time.

*McDowell v. Rogers*, 863 F.3d (6th Cir. 1988).

251.    Trooper Gabriel and trooper Kenny are each therefore liable for the damages

resulting from the excessive use of their batons.

## COUNT VI

### 42 U.S.C. 1983 – EXCESSIVE FORCE - HANDCUFFS

252.    Plaintiff incorporates by reference, as if set forth fully herein, each and every

averment, allegation and statement contained in all previous paragraphs of this

Complaint.

253.     Plaintiff incorporates by reference, as if set forth fully herein, each and every averment, allegation and statement contained in all previous paragraphs of this Complaint.

254.     Defendant Gabriel and Defendant Kenny acted with malice, negligence, and/or a primary purpose other than that of bringing an offender to justice and/or involved reckless, callous, and deliberate indifference.

255.     Defendant officers engaged in the conduct described by the Complaint willfully, maliciously, in bad faith, and in reckless disregard of the Plaintiff's federally protected constitutional rights.

256.     They did so with shocking and willful indifference to Plaintiff's rights and their conscious awareness that they would cause Plaintiff injury. These individual Defendants are not entitled to qualified immunity for the complained of conduct.

257.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered injury and damages. Defendants Sergeant Sonny Dunaway, Captain Chad Mills, Department of Kentucky State Police, and Commissioner Rodney Brewer are also liable under the doctrine of *respondeat superior*.

258.     Defendants Sergeant Sonny Dunaway, Captain Chad Mills, Department of Kentucky State Police, and Commissioner Rodney Brewer are also liable improper training, hiring, practices, custom and supervising.

259.     Trooper Kenny had the opportunity to prevent such use of force and did not. Trooper Kenny observed trooper Gabriel use excessive force and should have known trooper Gabriel was using excessive force. Trooper Kenny is liable for the resulting injuries for his failure to intervene and protect Mr. Dumphord.

260.     Any reasonable police officer knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time. *Courtright v. City of Battle Creek*, 839 F.3d (6th Cir. 2016).

261.     Trooper Gabriel and trooper Kenny are each therefore liable for the damages resulting from the excessive use of handcuffs.

## COUNT VII

### ASSAULT AND/OR BATTERY

262.     Plaintiff incorporates by reference, as if set forth fully herein, each and every averment, allegation and statement contained in all previous paragraphs of this Complaint.

263.     The actions of Defendant Trooper Gabriel and Defendant Trooper Kenny constituted unlawful acts which placed Plaintiff in reasonable apprehension of receiving immediate harm.

264.     Defendant Trooper Gabriel and trooper Kenny intended to cause contact, or the apprehension of such conduct when they took the following actions:

Trooper Gabriel slamming Mr. Dumphord's car door shut on his foot; Shoving Mr. Dumphord up against the vehicle; Telling Mr. Dumphord he was going to get hurt; Trooper Gabriel releasing canine Pluto from the vehicle; Trooper Gabriel telling Mr. Dumphord he would fuck him up; Yelling get him boy to canine Pluto to attach Mr. Dumphord; Brandish their Taser at and against Mr. Dumphord; Brandished their ASP at and against Mr. Dumphord;

47

265.     As a direct and proximate result of the conduct of the Defendant trooper Gabriel
and Defendant trooper Kenny, the Plaintiff suffered harm and damages including but not
limited to the aforesaid damages.

266.     The actions of Trooper Gabriel and trooper Kenny in assaulting the Plaintiff
justify an award of punitive damages against the defendant trooper Gabriel and defendant
trooper Kenny.

<div align="center">

**COUNT VIII**

**STATE LAW EXCESSIVE FORCE – CANINE**

</div>

267.     Plaintiff incorporates by reference, as if set forth fully herein, each and every
averment, allegation and statement contained in all previous paragraphs of this
Complaint.

268.     Trooper Gabriel and trooper Kenny did not have reasonable grounds to believe
and in good faith believe that Mr. Dumphord was committing a felony or misdemeanor in
their presence and violated KRS 431.025 & 431.005 & 431.015.

269.     Defendant trooper Gabriel and defendant trooper Kenny used more force than
was reasonably necessary in order to effect the arrest and willfully and maliciously
intended to harm the Plaintiff or acted with a corrupt motive.

270.     Defendant trooper Gabriel and defendant trooper Kenny did not have reasonable
grounds for making the arrest and used more force than was necessary.

271.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has
suffered injury and damages. Defendants Sergeant Sonny Dunaway, Captain Chad Mills,
Department of Kentucky State Police, and Commissioner Rodney Brewer are also liable
under the doctrine of *respondeat superior*.

272.     Defendants Sergeant Sonny Dunaway, Captain Chad Mills, Department of
Kentucky State Police, and Commissioner Rodney Brewer are also liable improper
training, hiring, practices, custom and supervising.

273.     Trooper Kenny had the opportunity to prevent such use of force and did not.
Trooper Kenny observed trooper Gabriel use excessive force and should have known
trooper Gabriel was using excessive force. Trooper Kenny is liable for the resulting
injuries for his failure to intervene and protect Mr. Dumphord.

<h2 align="center">COUNT IX</h2>

<h2 align="center">STATE LAW EXCESSIVE FORCE - TASERS</h2>

274.     Plaintiff incorporates by reference, as if set forth fully herein, each and every
averment, allegation and statement contained in all previous paragraphs of this
Complaint.

275.     Trooper Gabriel and trooper Kenny did not have reasonable grounds to believe
and in good faith believe that Mr. Dumphord was committing a felony or misdemeanor in
their presence and violated KRS 431.025 & 431.005 & 431.015.

276.     Defendant trooper Gabriel and defendant trooper Kenny used more force than was
reasonably necessary in order to effect the arrest and willfully and maliciously intended
to harm the Plaintiff or acted with a corrupt motive.

277.     Defendant trooper Gabriel and defendant trooper Kenny did not have reasonable
grounds for making the arrest and used more force than was necessary.

278.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has
suffered injury and damages. Defendants Sergeant Sonny Dunaway, Captain Chad Mills,

Department of Kentucky State Police, and Commissioner Rodney Brewer are also liable under the doctrine of *respondeat superior*.

279.      Defendants Sergeant Sonny Dunaway, Captain Chad Mills, Department of Kentucky State Police, and Commissioner Rodney Brewer are also liable improper training, hiring, practices, custom and supervising.

280.      Trooper Kenny had the opportunity to prevent such use of force and did not. Trooper Kenny observed trooper Gabriel use excessive force and should have known trooper Gabriel was using excessive force. Trooper Kenny is liable for the resulting injuries for his failure to intervene and protect Mr. Dumphord.

## COUNT X

## STATE LAW EXCESSIVE FORCE - BATON

281.      Plaintiff incorporates by reference, as if set forth fully herein, each and every averment, allegation and statement contained in all previous paragraphs of this Complaint.

282.      Trooper Gabriel and trooper Kenny did not have reasonable grounds to believe and in good faith believe that Mr. Dumphord was committing a felony or misdemeanor in their presence and violated KRS 431.025 & 431.005 & 431.015.

283.      Defendant trooper Gabriel and defendant trooper Kenny used more force than was reasonably necessary in order to effect the arrest and willfully and maliciously intended to harm the Plaintiff or acted with a corrupt motive.

284.      Defendant trooper Gabriel and defendant trooper Kenny did not have reasonable grounds for making the arrest and used more force than was necessary.

50

285.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has

suffered injury and damages. Defendants Sergeant Sonny Dunaway, Captain Chad Mills,

Department of Kentucky State Police, and Commissioner Rodney Brewer are also liable

under the doctrine of *respondeat superior*.

286.    Defendants Sergeant Sonny Dunaway, Captain Chad Mills, Department of

Kentucky State Police, and Commissioner Rodney Brewer are also liable improper

training, hiring, practices, custom and supervising.

287.    Trooper Kenny had the opportunity to prevent such use of force and did not.

Trooper Kenny observed trooper Gabriel use excessive force and should have known

trooper Gabriel was using excessive force. Trooper Kenny is liable for the resulting

injuries for his failure to intervene and protect Mr. Dumphord.

## COUNT XI

## STATE LAW EXCESSIVE FORCE - HANDCUFFS

288.    Plaintiff incorporates by reference, as if set forth fully herein, each and every

averment, allegation and statement contained in all previous paragraphs of this

Complaint.

289.    Trooper Gabriel and trooper Kenny did not have reasonable grounds to believe

and in good faith believe that Mr. Dumphord was committing a felony or misdemeanor in

their presence and violated KRS 431.025 & 431.005 & 431.015.

290.    Defendant trooper Gabriel and defendant trooper Kenny used more force than

was reasonably necessary in order to effect the arrest and willfully and maliciously

intended to harm the Plaintiff or acted with a corrupt motive.

291.     Defendant trooper Gabriel and defendant trooper Kenny did not have reasonable grounds for making the arrest and used more force than was necessary.

292.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered injury and damages. Defendants Sergeant Sonny Dunaway, Captain Chad Mills, Department of Kentucky State Police, and Commissioner Rodney Brewer are also liable under the doctrine of *respondeat superior*.

293.     Defendants Sergeant Sonny Dunaway, Captain Chad Mills, Department of Kentucky State Police, and Commissioner Rodney Brewer are also liable improper training, hiring, practices, custom and supervising.

294.     Trooper Kenny had the opportunity to prevent such use of force and did not. Trooper Kenny observed trooper Gabriel use excessive force and should have known trooper Gabriel was using excessive force. Trooper Kenny is liable for the resulting injuries for his failure to intervene and protect Mr. Dumphord.

## COUNT XII

### FALSE IMPRISONMENT

295.     Plaintiff incorporates by reference, as if set forth fully herein, each and every averment, allegation and statement contained in all previous paragraphs of this Complaint.

296.     On November 15, 2019, the Plaintiff was unlawfully imprisoned in violation of KRS 509.020 and *Com. V. Caudill*, 234 S.W.2d 499, (KY 1950), by defendant Trooper Gabriel and defendant trooper Kenny, who unlawfully detained Plaintiff.

297.     Defendant Gabriel and Defendant Kenny willfully and intentionally, without the Plaintiff's consent, unlawfully restrained the Plaintiff with no legal justification to do so.

298.     Defendant Gabriel and Defendant Kenny caused the Plaintiff's personal liberty
and freedom of movement to be restrained with no legal justification to do so.

299.     Defendant Gabriel and Defendant Kenny did not have probable cause to arrest
Plaintiff. There was not warrant for the Plaintiff. Neither trooper directly observed Mr.
Dumphord committing a felony or misdemeanor. Trooper Gabriel and trooper Kenny
violated KRS 431.025, KRS 431.005 and KRS 431.015.

300.     As a result of Defendant Gabriel and Defendant Kenny's intent and deliberate
indifference, Plaintiff was falsely imprisoned.

301.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has
suffered injury and damages. Defendants Sergeant Sonny Dunaway, Captain Chad Mills,
Department of Kentucky State Police, and Commissioner Rodney Brewer are also liable
under the doctrine of *respondeat superior*.

302.     Defendants Sergeant Sonny Dunaway, Captain Chad Mills, Department of
Kentucky State Police, and Commissioner Rodney Brewer are also liable improper
training, hiring, practices, custom and supervising.

303.     Trooper Kenny had the opportunity to prevent such use of force and did not.
Trooper Kenny observed trooper Gabriel use excessive force and should have known
trooper Gabriel was using excessive force. Trooper Kenny is liable for the resulting
injuries for his failure to intervene and protect Mr. Dumphord.

304.     Defendant Trooper Gabriel's and trooper Kenny's intentional unlawful arrest of
the Plaintiff resulted in substantial interference with the Plaintiff's liberty and resulted in
an offensive touching and malicious prosecution which caused the Plaintiff to suffer
mental anguish from the date of the incident from which he shall continue to suffer in the

53

future, physical pain from the date of the incident and which he shall continue to suffer from in the future,

<center>**COUNT XIII**</center>

<center>**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**</center>

305.    Plaintiff incorporates by reference, as if set forth fully herein, each and every averment, allegation and statement contained in all previous paragraphs of this Complaint.

306.    Defendant Troopers Gabriel and Kenny intentionally and deliberately inflicted emotional distress upon the Plaintiff to wit: (a) Unlawfully searching and seizing Plaintiff without a warrant; (b) Shoving Plaintiff up against his vehicle; (c) Verbally threatening Plaintiff; (d) beating plaintiff;

307.    Defendant Trooper Gabriel and defendant trooper Kenny knew or should have known their actions were likely to cause emotional distress.

308.    Defendant Trooper Gabriel's and defendant trooper Kenny's conduct was extreme and outrageous, as well as intolerable as it offends the generally accepted standards of morality and decency in a civilized society and acted intentionally and/or recklessly towards Plaintiff to cause Plaintiff to sustain emotional distress.

309.    As a direct and proximate result of Defendants' conduct, the Plaintiff suffered and continues to suffer severe emotional distress.

310.    The actions of the Defendants, in intentionally inflicting emotional distress upon the Plaintiff, justify an award of punitive damages.

311.    Plaintiff's resulting emotional distress was severe.

<center>54</center>

312.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has

suffered injury and damages. Defendants Sergeant Sonny Dunaway, Captain Chad Mills,

Department of Kentucky State Police, and Commissioner Rodney Brewer are also liable

under the doctrine of *respondeat superior*.

313.    Defendants Sergeant Sonny Dunaway, Captain Chad Mills, Department of

Kentucky State Police, and Commissioner Rodney Brewer are also liable improper

training, hiring, practices, custom and supervising.

314.    Trooper Kenny had the opportunity to prevent such use of force and did not.

Trooper Kenny observed trooper Gabriel use excessive force and should have known

trooper Gabriel was using excessive force. Trooper Kenny is liable for the resulting

injuries for his failure to intervene and protect Mr. Dumphord.

## COUNT XIV

### NEGLIGENCE AND GROSS NEGLIGENCE

315.    Plaintiff incorporates by reference, as if set forth fully herein, each and every

averment, allegation and statement contained in all previous paragraphs of this

Complaint.

316.    Defendant Troopers Gabriel and Kenny owed a duty of care to the Plaintiff to

follow the proper police policies, procedures, and techniques, and to act as reasonable

police troopers would act under the same circumstances to ensure the Plaintiff's safety.

317.    Defendant troopers breached this duty of care by: failing to follow standard police

procedures, and/or failing to act as reasonable police troopers under the same or similar

circumstances.

318.     Defendants Sergeant Sonny Dunaway, Captain Chad Mills, Department of

Kentucky State Police, and Commissioner Rodney Brewer owed a duty of care to hire,

train, and supervise the Defendant Troopers Gabriel and Kenny and to take steps to

prevent events such as occurred here.

319.     Defendants Sergeant Sonny Dunaway, Captain Chad Mills, Department of

Kentucky State Police, and Commissioner Rodney Brewer breached this duty of care by:

failing to use care in hiring Defendant Troopers Gabriel and Kenny and/or; failing to

properly train the Defendant Troopers Gabriel and Kenny and/or; failing to supervise the

Defendant Troopers Gabriel and Kenny to ensure their conduct met the standard of

ordinary police troopers.

320.     Defendant Troopers Gabriel and Kenny owed a duty of care to the Plaintiff to

preserve his safety during their attempts to carry out their duties.

321.     Defendant Gabriel and Defendant Kenny owed a duty to Plaintiff, to protect him

from harm and to treat him fairly and lawfully.

322.     Defendant Gabriel and Defendant Kenny breached that duty by failing to perform

proper due diligence before unlawfully stopping, arresting, searching and using excessive

force toward the Plaintiff.

323.     Defendant Gabriel and Defendant Kenny's breach of their duty was the factual

cause and legal cause of Plaintiff's harm.

324.     Sergeant Sonny Dunaway, Captain Chad Mills, Department of Kentucky State

Police, and Commissioner Rodney Brewer, as the individual Defendants' employer and

supervisor, are liable for Defendant Gabriel and Defendant Kenny's negligence and

breach of duties by principles of agency and/or directly.

56

325.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has

suffered injury and damages. Defendants Sergeant Sonny Dunaway, Captain Chad Mills,

Department of Kentucky State Police, and Commissioner Rodney Brewer are also liable

under the doctrine of *respondeat superior*.

326.     Defendants Sergeant Sonny Dunaway, Captain Chad Mills, Department of

Kentucky State Police, and Commissioner Rodney Brewer are also liable improper

training, hiring, practices, custom and supervising.

327.     Trooper Kenny had the opportunity to prevent such use of force and did not.

Trooper Kenny observed trooper Gabriel use excessive force and should have known

trooper Gabriel was using excessive force. Trooper Kenny is liable for the resulting

injuries for his failure to intervene and protect Mr. Dumphord.

## COUNT XV

### NEGLIGENT AND IMPROPER HIRING PRACTICE AND INADEQUATE TRAINING AND NEGLIGENT SUPERVISION, HIRING, AND TRAINING

328.     Plaintiff incorporates by reference, as if set forth fully herein, each and every

averment, allegation and statement contained in all previous paragraphs of this

Complaint.

329.     For a governmental entity is liable under § 1983 only when the entity itself is a "

'moving force' " behind the deprivation, *Polk County v. Dodson*, 454 U.S. 312, 326, 102

S.Ct. 445, 454, 70 L.Ed.2d 509 (1981) (quoting *Monell*, 436 U.S., at 694, 98 S.Ct., at

2037).

330.     In an official-capacity suit the entity's "policy or custom" must have played a part

in the violation of federal law. *Monell*, supra; *Oklahoma City v. Tuttle*, 471 U.S. 808,

57

817–818, 105 S.Ct. 2427, 2433, 85 L.Ed.2d 791 (1985); id., at 827–828, 105 S.Ct., at

2437, 2438 (BRENNAN, J., concurring in judgment).

331.     Defendant Sergeant Sonny Dunaway, Captain Chad Mills, Department of

Kentucky State Police, and Commissioner Rodney Brewer were negligent in the hiring

and training of Defendant trooper Gabriel and trooper Kenny.

332.     Defendant Sergeant Sonny Dunaway, Captain Chad Mills, Department of

Kentucky State Police, and Commissioner Rodney Brewer are directly liable for their

tortious and unconstitutional conduct, as described throughout this Complaint.

333.     Defendant Sergeant Sonny Dunaway, Captain Chad Mills, Department of

Kentucky State Police, and Commissioner Rodney Brewer are liable for the actions of the

other Defendants under the doctrine of *respondeat superior*, as well as directly for the

aforementioned negligence.

334.     Defendant Sergeant Sonny Dunaway, Captain Chad Mills, Department of

Kentucky State Police, and Commissioner Rodney Brewer owed a duty to Plaintiff to use

ordinary and reasonable care in properly hiring, training, and supervising Defendant

Gabriel and defendant Kenny, and they breached that duty by failing to use ordinary and

reasonable care in hiring, training, and supervising Defendant Gabriel and Defendant

Kenny and allowing the aforementioned events to take place.

335.     Defendant officers engaged in the conduct described by the Complaint willfully,

maliciously, in bad faith, and in reckless disregard of the Plaintiff's federally protected

constitutional rights. They did so with shocking and willful indifference to Plaintiff's

rights and their conscious awareness that they would cause Plaintiff injury.

336.    These individual Defendants are not entitled to qualified immunity for the complained of conduct.

337.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered injury and damages. Defendants Sergeant Sonny Dunaway, Captain Chad Mills, Department of Kentucky State Police, and Commissioner Rodney Brewer are also liable under the doctrine of *respondeat superior*.

338.    Defendants Sergeant Sonny Dunaway, Captain Chad Mills, Department of Kentucky State Police, and Commissioner Rodney Brewer are also liable improper training, hiring, practices, custom and supervising.

## COUNT XVI

## MALICIOUS PROSECUTION

339.    Plaintiff incorporates by reference, as if set forth fully herein, each and every averment, allegation and statement contained in all previous paragraphs of this Complaint.

340.    As a result of the unlawful charges against the Plaintiff and unlawful arrest of the Plaintiff and incidents having taken place on November 15, 2019, Defendant trooper Gabriel and Defendant trooper Kenny, initiated, continued and procured a criminal proceeding against the Plaintiff, specifically proceeding No. 19-CR- 00149 in Bourbon, County Kentucky.

341.    Probable cause did not exist for the Defendant Troopers to initiate a criminal proceeding against the Plaintiff.

342.     Defendant Gabriel and Defendant Kenny acted with malice, negligence, and/or a primary purpose other than that of bringing an offender to justice and/or involved reckless, callous, and deliberate indifference.

343.     The proceedings are currently pending. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered injury and damages.

344.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered injury and damages. Defendants Sergeant Sonny Dunaway, Captain Chad Mills, Department of Kentucky State Police, and Commissioner Rodney Brewer are also liable under the doctrine of *respondeat superior*.

345.     Defendants Sergeant Sonny Dunaway, Captain Chad Mills, Department of Kentucky State Police, and Commissioner Rodney Brewer are also liable improper training, hiring, practices, custom and supervising.

346.     They are each therefore liable for the damages resulting from the malicious prosecution by trooper Kenny and trooper Gabriel.

## COUNT VII - FAILURE TO TREAT

347.     Plaintiff incorporates by reference, as if set forth fully herein, each and every averment, allegation and statement contained in all previous paragraphs of this Complaint.

348.     During her care and treatment of Plaintiff, the Defendant, Sandra F. Geile, M.D. acted negligently and failed to exercise the requisite degree of care and skill, and such negligence was a factor in causing the injury and damages sustained by the Plaintiff.

349.     The care and treatment of the Plaintiff, by the Defendant, Sandra F. Geile, M.D., fell below the prevailing standard of professional care for an emergency care physician in one or more of the following ways:

a.  Failure to properly document the symptoms experienced by the Plaintiff during his time receiving care.

b.  Failure to properly consider and/or diagnose the Plaintiff's excruciating and severe pain wrist or forearm, despite repeated complaints.

c.  Failure and/or refusal to perform an x-ray, imaging or MRI of the area where the Plaintiff was experiencing pain so it could be determined that the cause of that pain was from a fracture.

350.     The Defendant, Sandra F. Geile, M.D. failed to diagnose Plaintiff with a fractured wrist, ignoring Plaintiffs complaints of pain coming from that area of his body. Despite Plaintiff's complaints, no x-rays, imaging or MRI were taken to determine if there was a break.

351.     As a result of this failure by the Defendant, Sandra F. Geile, M.D., Plaintiff was discharged from Bourbon Community Hospital without his wrist being stabilized, causing him to be transported in and out of handcuffs until his release from the Bourbon County Jail.

352.     The Defendant Bourbon Community Hospital is liable under the doctrine of *Respondeat Superior*.

**WHEREFORE**, Plaintiff Brian Todd Dumphord hereby demands:

A.     Judgment against all Defendants for actual, special, punitive and compensatory damages, in an amount greater than the jurisdictional minimum of this honorable Court, deemed at time of trial to be just, fair, and appropriate.

B.     Judgment against Trooper Jack Gabriel, in his official and individual capacities, for physical and emotional/mental damages and pain and suffering, permanent injury, humiliation and embarrassment, for inconvenience, compensatory damages, punitive damages, and attorney's fees and interest;

C.     Judgment against Trooper Kenny, in his official and individual capacities, for physical and emotional/mental damages and pain and suffering, permanent injury, humiliation and embarrassment, for inconvenience, compensatory damages, punitive damages, and attorney's fees and interest;

D.     Judgment against Kentucky State Police Department for physical and emotional/mental damages and pain and suffering, permanent injury, humiliation and embarrassment, for inconvenience, compensatory damages, punitive damages, and attorney's fees and interest;

E.     Judgment against Defendant Sergeant Sonny Dunaway for physical and emotional/mental damages and pain and suffering, permanent injury, humiliation and embarrassment, for inconvenience, compensatory damages, punitive damages, and attorney's fees and interest

F.     Judgment against Defendant Captain Chad Mills for physical and emotional/mental damages and pain and suffering, permanent injury, humiliation and embarrassment, for inconvenience, compensatory damages, punitive damages, and attorney's fees and interest

62

G. Judgement against Defendant Commissioner Rodney for physical and emotional/mental damages and pain and suffering, permanent injury, humiliation and embarrassment, for inconvenience, compensatory damages, punitive damages, and attorney's fees and interest

H. Plaintiff's physical, mental and emotional anguish and pain and suffering were unnecessary and preventable. Plaintiff is entitled to recover for the wanton and unnecessary pain and suffering he endured. Defendants' violations of Plaintiff's constitutional and common law rights were egregious and a reckless disregard for Plaintiff's safety and rights. Plaintiff is entitled to recover punitive damages and attorney's fees from Defendants in order to deter such conduct in the future.

I. Trial by jury;

J. Pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and costs pursuant to 42 U.S.C. § 1920; and

K. For any and all other relief to which he may be entitled.

Respectfully Submitted,

**/s/ Zack McKee**
Attorney Zack McKee
Attorney Colin Edmundson
McKee Law Office
908 Minoma Avenue
Louisville, KY 40217
Phone: (502) 792-7119
Fax: (502) 584-0656
mckeeslaw@gmail.com
*Attorney for Plaintiff Brian Dumphord*